Judge Edwin A. Lombard |! Before the court in these consolidated' cases are the cross-appeals of Michael Edward Blake (“Mr. Blake”) and Alicia Victoria DiMarco Blake (“Ms. DiMarco”).[1] After review of the record in light of the applicable law and arguments of the parties, we find Ms. DiMarco’s nullity action was untimely filed, reverse the district court judgment of October 31, 2011, and vacate the district court judgment of June 2, 2016. Relevant Facts and Procedural History The parties were married on November 14, 2003. On March 8,2005, Mr. Blake filed a petition for divorce. On March 10, 2005, Ms. DiMarco filed a petition for divorce.[2] Pursuant to a consent judgment signed on October 27, 2005, the community property regime was terminated with an effective date of March 8, 2005. The parties were divorced on November 21, 2005, reserving the community property partition issue to be decided at a later date. 1 ¡¿There were two major assets at issue in the community property partition:. (1) the matrimonial domicile in Belle Chasse, Louisiana, purchased by Mr. Blake with separate funds but placed jointly in his name and Ms. DiMarco’s on the act of sale and property deed[3] and an oil rig (“the Blake 505”)' purchased after the termination of the community by a business entity organized and registered by Mr. Blake during the marriage. Specifically, Mr. Blake (whose career in oil related businesses is apparently quite financially rewarding) registered Blake- - Offshore Drilling Company, LLC (“Blake Offshore Drilling”) with the Louisiana Secretary of State on February 18, 2005, approximately fifteen’months after marrying Ms, Blake and less than a month before the parties each filed for divorce. In April 2005, after the community property regime was terminated, Blake Offshore Drilling acquired its major asset, the oil rig subsequently named the,Blake 505. Unlike Mr. Blake’s other business interests, Blake Offshore Drilling (and the Blake 505) became subject to claims in the community partition because it was organized during the brief marriage. During the discovery and document exchange related to the community partition, the claim for Ms. DiMarco’s half ownership of Mr. Blake’s interest in Blake Offshore Drilling was communicated to Mr. Blake and, in response, a letter was sent to Ms. DiMarco requesting payment to Mr. Blake of half of the $874,462.07 paid in “capital calls” by Mr. Blake on behalf of Blake Offshore Drilling as of January 2006. Shortly thereafter, on March 8, 2006, Mr. Blake (as managing member of Blake Offshore Drilling) filed a lawsuit against Ms, iMarco[4] alleging that, in light of Ms. DiMarco’s claimed community property ownership interest in the company, the company’s lack of income, and significant capital infusion requirements for ongoing operations, Ms, DiMarco was responsible for $437,231.04 to Blake Offshore Drilling for her portion of the past capital contributions made by Mr. Blake through January 2006, as well as future. payments of approximately $46,250.00 . per month for her portion of the monthly “capital calls.” Our review of the record indicates that the Bláke 605 was a primary focus during the discovery process and interchanges between the parties prior to the compromise agreement settling the community partition entered into by the parties: ’ (1) In a correspondence dated March 14, 2006, Ms. DiMarco’s counsel, Robert Lowe, advised Mr. Blake’s counsel: “Also, I want to have someone take a look at the rig that is owned by the entity, Blake Offshore Drilling Company, L.L.C. If you can tell me who our expert should contact concerning the rig, he can make his arrangements directly, as opposed to having it come through this office.” On March 14, 2006, Mr. Lowe faxed a letter dated March 27, 2006, to Mr, Blake’s counsel requesting confirmation of the deposition schedule, adding: Also I told you that I wanted an expert to go out and look at the rig, I need an answer. I do not want to have to file a Rule on this.” A note on the cover sheet (dated March 14, 2006) indicated that Mr. Lowe “dictated this before we spoke today.” (2) By letter dated March 28, 2006, to Mr. Blake’s counsel, Mr. Lowe stated: “I need the name of the rig that I previously Corresponded with you about, and I also need to know where it is located. As advised, we want to view it.” (3) On April 11, 2006, in a letter related to Mr. Blake’s Whitney Bank documents, ’ Mr. Lowe confirmed Mr. Blake’s upcoming deposition scheduled for April 25, 2006, arid the trial date scheduled for May 30, 2006, advising Mr. Blake’s counsel (emphasis added): “As we discussed with the Judge, I want to have an expert review the rig, which you claim was the “old Jed-co.” If there is something you |4want the expert to sign, such as the hold harmless you mention, get me a draft of it. The expert’s name is Dave Sanderson.” (emphasis added). At the deposition of Mr. Blake, wherein Mr. Blake’s business and financial interests were discussed extensively,[5] the Blake 505 was a major point of questioning. Mr. Blake answers in response to specific questions related to the value and potential of Blake Offshore Drilling and its primary asset, the Blake 505, were equivocal, referencing the cost of the rig, the necessity and expense of refurbishing it (seventeen million dollars), the difficulties in selling the rig (because it was not designed to operate in the Gulf of Mexico and needed to be refurbished), and financing of the rig by Whitney Bank. It should be noted, however, that Mr. Blake’s, valuation of the rig was in the context of repeated assurances made by Ms. DiMarco’s counsel to Mr. Blake’s counsel, that as exemplified by the following colloquy, an independent maritime expert had been retained on behalf of Ms. DiMarco and that an independent appraisal was forthcoming: MR. LOWE: David, I don’t know what the Whitney has; but obviously on this thing, we’re going to have to get the organizational documents, the capitalization documents, and that type of thing, MR. HUFFT: My best advice is to subpoena them from Mike Riess [Mr. Blake’s business counsel] and let him make a return on that subpoena. MR. LOWE: Well, you got- MR. HUFFT: I can call and ask him. MR. LOWE: You got to tell him to just produce the stuff to us; - because, to go throügh a lawyer, it’s a little bit more difficult. So you | Bare agreeing that he can produce all the documents whatever iii reference to that company. MR. HUFFT: That is fine. Because that is a—that technically has the community interest.' ' MR. LOWE: I’m not sure what it is or what it has, was capitalized or what it’s worth; and, I’ve been asking you in writing. We have had this thing set in a little bit more than a month. I need to get somebody to go out and look at this thing. I retained somebody, and I need—and they need to go see it. (emphasis added). MR. HUFFT: I understand. And we’re going to give you some documents to sign and everything. MR. LOWE: Well, you got to get them to me. MR. HUFFT: We will MR. LOWE: Because I don’t control this guy’s schedule, okay. MR. HUFFT: I understand. MR. LOWE: And we need to do it pretty quickly and I’ve—and I’ve been asking. It’s in Pascagoula somewhere. MR. BLAKE: Shipyard. Mr. Blake also confirmed, in response to questioning about the formation of Blake Offshore Drilling and its asset, the Blake 505, that funding for the business entity and its primary asset was based solely on Mr. Blake’s personal guarantee to Whitney Bank for eleven or twelve million dollars, that Ms. DiMarco was not involved in the project and made no personal guarantees on the project, and that as a “protective measure” he never discussed Blake Offshore Drilling with Ms. DiMarco after the “Declaration of Separateness” was recorded in April 2005. When asked why he formed a business in February 2005 (shortly before filing for divorce) that would be a “community entity,” Mr. Blake conceded that he did not think of the community property implications at the time he formed Blake Offshore Drilling. Rather, he formed the entity to purchase the Oil rig in | f,anticipation of an “overseas contract,” but the potential contract did not come to fruition and, since then, Mr. Blake and his partner (in Blake Offshore Drilling) had “[b]een trying” to sell it to “|j]ust anybody that would have it.” Mr. Blake was not asked, however, as to any specific parties previously or currently expressing any interest in purchasing the rig. When asked about details of the Whitney Bank funding for Blake Offshore Drilling, the “overseas contract” that “fell through,” and about documentation related to “’’the deal [that] fell through,” Mr. Blake explained that there had been no “deal” because “there is no revenue produced by it,” and there was no documentation of the potential sale because it was “verbal” with “no contract signed.” When questioned as to why it was necessary to refurbish the rig, Mr. Blake explained it was “to get it in other parts of the world where it could be used.” When asked why they were only “slowly working” on refurbishing the rig, Mr. Blake explained that “it eats a lot of money,” funds that came out of his “own pocket” which could be verified by talking to his Chief Financial Officer, the person handling the specific financial details and records related to the rig. When asked why he was “delaying” refurbishing the rig so that'it could be sold, Mr. Blake explained that, through his other companies, he had “three rigs in a shipyard getting outfitted ... [s]o it’s very expensive” and I’m limited on what I can do cashwise.” When asked “what support do you have for the 17 million to refurbish” (the rig to make it operational), Mr. Blake responded that his “operational guy[ ],” Rodney Meisetschlager “produced” the budget for refurbishing. Finally, when asked if “any offers had been made to buy the rig,” Mr. Blake initially said “no,” but then qualified his answer: “Well, I mean, we’ve—we’ve talked to people; ^talked to brokers; trying to bring people over there to buy it. Just hadn’t got any takers. Not in very good shape.” When asked directly as to his selling price, Mr. Blake stated that was something he’d have to discuss with his partner. When asked his opinion as to what it was worth in its current condition, Mr. Blake said “I don’t have it. I don’t know.” Mr. Lowe then asked about whether Mr. Blake had done a personal financial statement subsequent to June 14, 2005, and Mr. Blake deferred the question, stating that he was unsure but that, if he had, it would be in the Whitney records produced during discovery. However, although Mr. Blake never responded with a specific valuation of the rig during extensive questioning, he did point out that the Whitney Bank had the rig independently appraised in February 2005 and, although he was unsure of the exact figure, it was in “the records” which were in the possession of Ms. DiMarco’s counsel. Mr. .Blake testified that he “pumped another three million dollars into this thing” after the Whitney appraisal. He acknowledged that, although his financial statement of October 2005 valued the rig at $8,450,000.00, he had not had it appraised since the purchase. Under further questioning, Mr: Blake thought the rig had been purchased in March 2005 but was advised by Ms. DiMarco’s counsel that the “transaction date” of the purchase, as reflected in the ‘Whitney files,” was April 15, 2005. The deposition continued with wide-ranging questions about Mr. Blake’s businesses and finances, his personal use (often accompanied by Ms. DiMarco during the marriage) and cost of an airplane owned by one his business entities, the expenses related .to trips with Ms. DiMarco to Las Vegas and Sturgis, South Dakota, credit card charges at clubs , in New Orleans and elsewhere, over $70,000 [8in checks made payable to various casinos in a 7-month period during the marriage, as well as expenses related to big game fishing trips ($30,000), a hunting lease in Texas ($8000), a deer lease in Mississippi ($12,000) and the use of his boat, the “Strike It Rich.” Mr. Blake likewise conceded that he spent $7,555.27 on a fur coat for Ms. DiMarco,[6] as well as earrings for her which cost $6800.00. Mr. Blake also conceded that, in addition to paying for all their travel and entertainment expenditures, he gave Ms. DiMarco a check for at least $11,000 (and averaging over $14,362) every month for the duration of the marriage. With regard to the other primary asset at issue in the community partition, the matrimonial domicile, - Mr. Blake stated that he talked to his business lawyer (Michael Riess) after Ms. DiMarco refused to sign the prenuptial agreement who advised him to keep his property separate and not comingle it during the marriage. Mr. Blake confirmed that he never discussed' the house with Ms. DiMarco or his expectation (based upon his lawyer’s advice) that' it remained his separate property based on its purchase with his separate funds. The deposition ended with the following colloquy (emphasis added): MR. LOWE: But you married her. Even though she refused to sign the Prenup, you went ahead and went with it and without her signing the Prenup that addressed the house, is that correct? MR. BLAKE: Well, I had the house ’issue covered by the attorney. MR. LOWE: You thought you had it covered. Well, whether you have it covered will be for that Judge over there to determine. We will see. That’s the deal. You went ahead and married her, right? MR. BLAKE: There you go. Let’s see .... (emphasis added). |flDespite repeated references to the expert maritime appraiser who had been retained to inspect and appraise the Blake 505,[7] Ms. DiMarco and her counsel proposed a compromise agreement to settle the community property partition without going forward 'with the independent appraisal of 'the Blake 505. On May 5, 2006, counsel for Ms. DiMarco proposed the following settlement agreement: Mr. Blake will pay Alicia Blake $450,000,00 in cash no later than five weeks from the date that the agreement is signed, or sooner if she vacates the former matrimonial domicile, at the time she vacates the matrimonial domicile. Additionally, Ms. Blake will receive, the contents of the home, the ■ movables ¡ in her. possession, the horse trailer, two horses, and the riding green lawnmower. Ms. Blake will have use of the tractor while she continues to reside in the home, supra, and she will cut the grass. She will maintain the home, as she has in the past, and leave it broom clean when she vacates. .In the partition, Mr. Blake mil receive any and all assets registered in his name or for his account, and all other community assets, not allocated to Ms. Blake, above. Additionally, he will receive full ownership of the former matrimonial domicile. Mr. Blake mil assume all community liabilities, known or unknown, liquidated or unliquidated, and indemnify and hold harmless Ms. Blake. Additionally, the lawsuit filed by BODC [Blake Offshore Drilling, owner of the rig Blake 505] will be dismissed, with prejudice, at his cost. 'Each party will pay their ownattor-néy’s fees, and costs. The community will be fully settled, and all reimbursements claims, of whatever nature or type, will be settled. [[Image here]] Concerning.the alimony issues, interim spousal support will be considered fully satisfied with the payment of the April, 2006, spousal support. Ms.- Blake waives final spousal-support. Ms. Blake will revert to her maiden name; and I will prepare an appropriate Order to accomplish that. I ask that you sign this letter^' on behalf of your client, and get it back to me. X will undertake the preparation of the final Judgment of Partition and the waiver of final spousal support. I am very glad the parties were able to amicably resolve this matter, 'and I appreciate your. help, (emphasis added). 11()This letter agreement to settle the community property partition was accepted and signed by Mr. Blake on May 5, 2006. On May 23, 2006, a document entitled “Vessel and Equipment Sale Agreement— Blake 505” was executed on behalf of Blake Offshore Drilling to sell the Blake 505 and certain equipment for $24,250,000. On June 23, 2006, separate bills of sale were executed for the Blake 505 and the equipment. The Consent Judgment ‘for Partition of Community Property and Settlement of Claims (as drafted by Ms. 'DiMarco’s counsel and signed by the district court judge without Mr. Blake’s signature or presence), entered on June 30, 2006, fully and finally partitioned all’claims and potential claims between’the parties.[8] In accordance with the consent agreement, the lawsuit against Ms. DiMarco pertaining to Blake Offshore Drilling was dismissed and Ms. DiMarco received all household furnishing, furniture, artwork, and movable property in her possession and control (including 2 horses, a horse-trailer, and a small tractor/riding lawnmower) and $450,000 in cash.[9] In return, Mr. Blake received in full ownership of: (1) Any and all assets registered in his name or for his account; - (2) Any other community assets not allocated to Alicia DiMarco, including without limitation, Blake Offshore Drilling Company, L.L.C,, and with the parties knowing waiver of more particular itemization, (emphasis added). (3) The former matrimonial domicile located at 12194 Highway 23, Belle Chase, Louisiana, 70037 .... InThe parties agreed that Ms. DiMarco would vacate the former matrimonial .domicile, leaving the premises "broom clean” and Mr. Blake would pay her the $450,000 in cash by July 5, 2006, or sooner when Ms. DiMarco vacated the matrimonial domicile. . The Consent Judgment, as drafted by Ms. DiMarco’s counsel, also included the following specific provisions: IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the parties do each hereby mutually release and relieve each other from any claims or causes of action .that each ma/y have had against each other concerning property, community and jointly owned. All reimbursement claims of whatever nature and type be and the same are,hereby settled. The parties knowingly waive a more particular itemization. The former community property is fully settled. IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the court hereby accepts the representations of the parties hereto that they have each had full opportunity to consult with legal counsel concerning this Judgment and community property settlement; that they each acknowledge they are entering into this Consent Judgment freely and voluntarily; that they have ascertained and weighed all of the facts and circumstances likely to influence their judgment herein; that they have been apprised of fheir respective legal rights concerning this Judgment; that all the provisions of this Judgment: as well as all questions pertinent thereto have been fully and satisfactorily explained to them to the extent they deem necessary; and that they have given due consideration to such provisions and questions and that they understand clearly and assent to all of the provision of this Consent Judgment( * * * IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this is a full and final partition of all community property and settlement of all claims between the parties. The parties hereto release and relieve each other from any further accounting except as specifically provided herein, (emphasis added). The payment of the $450,000.00 to Ms. DiMarco was delayed by a dispute over whether Ms. DiMarco left the-.residence “broom clean” and whether payment could be delayed on that basis, The matter was resolved on August 8, 2006, with a |,¿judgment read into the record (although not filed in written form until August 22, 2006), finding Mr. Blake in contempt of court and' ordering him to pay Ms. DiMarco $455,161 (the principal sum of $450,000, plus interest and attorney’s fees) by 4 p.m. on Friday, August 11, 2006. Mr. Blake apparently complied and the matter appeared settled. Meanwhile, in “late summer 2006,” Ms. DiMarco heard from her neighbor that Blake Offshore Drilling sold the Blake 605 for a substantial sum.[10] On September 18, 2006, Ms. DiMarco’s counsel sent a letter to Mr. Blake’s counsel inquiring as to whether the former “community entity” sold for $24,000,000. Mr. Lowe then sent a letter dated October 23,2006, to Michael J. Kingsbery, CPA, stating the following: Do you have -the name of the rig that was owned by the community entity in this matter? Assuming you do, is there some sort of registration for transactions involving rigs? Please check into that and let me know. As you know, Alicia was advised that the entity sold the rig for considerable money. On October 26, 2006, Mr. Kingsbery responded: I received your letter of October 23rd, 2006 regarding the information on the rig in connections with [Blake v. Blake]. I spoke with Dave Sanderson, and he indicated to me that he believed all movable rigs of this size had to be registered with the Coast Guard, and that he could probably trace down any transactions that have occurred with respect to this rig if we can get him the vessel identification number. I am going to have someone go back through the documents that were produced in this case, more particularly the documents that were produced from Whitney National Bank related to the financing of this rig, to see if we can find a vessel identification number. I will then contact Mr. Sanderson and see what the next step might be. Of course, any billing arrangements would have to be made between Alicia and Mr. Sanderson. 1iaOn October 12, 2007, Ms. DiMarco filed a Petition for Lesion, asserting that she signed the consent agreement based on Mr. Blake’s deposition testimony and discovered subsequently that the settlement agreement was disproportionately advantageous to Mr. Blake when the Blake 505 was sold for a sum in excess of twenty million dollars. Ms. DiMarco asserted that Mr. Blake misrepresented the true value of the Blake 505 and that, in agreeing to the Consent Judgment, she relied on Mr. Blake’s misrepresentation. Therefore, Ms. DiMarco argued that she should be awarded her proportionate share of the community property in addition to court costs and attorney fees incurred in litigating the matter. On November 7, 2007, Mr. Blake filed a declinatory exception of insufficient service of process. On March 12, 2008, after service of the petition was properly made, Mr. Blake filed an exception of res judicata and no cause of action, asserting Ms. Di-Marco’s claims had been decided in the Consent Judgment of June 30, 2006, and, therefore, the Petition for Lesion failed to state a cause of action. After a hearing, the district court granted the exceptions of res judicata and no cause of action on August 12, 2008, but, accepting Ms. DiMarco’s argument that the petition sought a rescission of the Consent Judgment on the basis of misrepresentation, ordered Mr. Blake to furnish documents responsive to Ms. DiMarco’s Request for Production of Documents within fifteen days. Ms. DiMarco filed a writ application in this court seeking supervisory review of the district court judgment. In response, counsel for Mr. Blake argued that this court should not consider Ms. DiMarco’s writ application because, in light of the remaining claim related to Mr. Blake’s alleged misrepresentation, all issues lubetween the parties would not be resolved.[11] Observing that “the parties agree that issues concerning Relator’s claims of misrepresentation and/or fraud and error remain to be resolved by the trial court,” this .court denied Ms. DiMár-, co’s writ application on January 6, 2009, based on her failure to show that the exercise of the court’s supervisory jurisdiction “will likely end this litigation.” Blake v. Blake, 08-1219, p. 1 (La. App. 4 Cir. 1/6/09). Meanwhile, on October 14, 2008, Mr. Blake filed an exception of prescription in the district court asserting that Ms. Di-Marco’s petition was untimely filed based on: (1) Ms. DiMarco’s answer to an interrogatory that she learned of the sale of the Blake 505 in the “[l]ate summer of 2006;” and (2) the letter of inquiry by her counsel dated September 18, 2006 (addressed to Mr. Blake and copied to Ms. DiMarco) regarding the sale of the Blake 505 for $24,000,000. Mr. Blake asserted that all of the claims in Ms. DiMarco’s petition, including the suggested nullity action, had prescribed by the tim.e she filed it on October 12, 2007, because Ms. DiMarco had the requisite knowledge to begin the prescriptive period by September 18, 2006, at the latest. In response, Ms. DiMarco conceded that although she heard rumors of the oil rig sale in the summer of 2006, she did not have sufficient constructive knowledge of Mr. Blake’s fraud or ill practices for prescription purposes prior to October 12, 2006, because Mr. Blake’s attorneys failed to respond to the September 2006 inquiry regarding the sale of the oil rig. lujThe trial court deferred the ruling on the prescription issue until after the determination of the merits of the nullity action. Mr. Blake testified at the six-day hearing on the nullity action that, in essence, the primary negotiations for the sale of the Blake 505 were just “talk” until an actual sale of contract was signed and that the contract was not signed until May 5, 2006, the day he and Ms. Blake signed the letter of- agreement on the settlement terms.[12] On October 31, 2011, the district court rendered judgment in favor of Ms. DiMar-co, declaring the Consent Judgment to be a nullity and overruling Mr. Blake’s exception of prescription. In its reasons for judgment, the district court found that at the time of his deposition, Mr. Blake possessed material and pertinent information regarding the value of the Blake 505 in-eluding: (1) the existence of two potential buyers interested in purchasing the Blake 505; (2) a potential job for the rig overseas: (3) that a broker (Steve Laurence) was working on the deal for the job overseas; (4) the existence of documents regarding efforts to sell the Blake £>05; and (5) the existence of a “serious agreement” for the sale of the Blake 505. The district court also found that, based on Mr. Blake’s representations in the lawsuit filed against Ms. DiMarco and Mr. Blake’s deposition testimony, Ms. DiMarco “reasonably concluded that the Blake 505 had little or no value and there were no potential buyers or „takers' for the Blake 505 or documents in existence related to the efforts to sell the Blake 505,” Accordingly, the district court held 11Rthat “Blake’s actions and inactions prior to the June 30, 2006 Consent Judgment effectively prevented DiMarco from discovering material information concerning the value of the Blake 505.” The district court also opined that, based on the evidence adduced at the hearing, Mr. Blake delayed signing any sale related documents until after Ms. DiMarco agreed on the community property settlement so that, although he and his partner, had agreed to go forward with the salé on May 4, 2006, the sale agreement was not signed until May 5, 2006; the same day he and Ms. DiMarco signed the letter of agreement as to the settlement terms. Notably, Ms. DiMarco did not return the $455,000.00 received in the Consent Judgment after it was declared a nullity. After the community property partition case was tried in 2015, a judgment was issued on June 2, 2016, ordering Mr. Blake to pay Ms. DiMarco $2,774,327.04 plus $1,473,691.07 in prejudgment interest for an, additional award of $4,248, 018.11. In addition, Ms. DiMarco was awarded attorney’s fees of $385,000.00 and $17,000.00 for the nullity action. Mr. Blake timely appeals this judgment. Ms. DiMarco also filed a devolutive appeal of the August 22, 2008, judgment granting Mr. Blake’s exceptions of res judicata and no cause of action. Assignments of Error On appeal, Mr. Blake argues that- the district court erred in failing to dismiss Ms. DiMareo’s petition after finding her lesion claims barred by exceptions of res judicata and no cause of action. Mr. Blake also argués that the district court erred in denying his exception of peremption[13] because the evidence clearly shows that JjjMs. DiMarco had sufficient knowledge to initiate an investigation more than a year prior to filing her Petition for Lesion. Additionally, Mr. Blake contends that he was deprived .of substantial rights (thus .requiring this court’s de novo review of the record) when the trial court (1) relieved Ms. DiMarco of her burden of proof and relied on irrelevant evidence; (2) expanded the record beyond relevant events; (3) excluded evidence as to. the classification of Blake Offshore Drilling and refusing to treat it as separate juridical entity; and (4) refused to limit valuation evidence to the date of the trial. Mr. Blake further asserts that the district court committed manifest error in awarding $1.4 million in prejudgment interest on the final equalizing payment. Finally, Mr. Blake argues that the district court erred in awarding Ms. Di-Marco attorney fees and costs. In response, Ms. DiMarco contends that district court did not err in allowing the matter to proceed after granting Mr. Blake’s exception of no cause of action because her petition and supplemental petitions for lesion clearly stated a cause of action other than lesion. Ms. DiMarco asserts that the district court did not err in denying Mr. Blake’s exception of prescription and, alternatively, that Mr. Blake failed to timely appeal the judgment nullifying - the consent judgment and, | ^therefore, that judgment is final.[14] Ms. DiMarco also asserts that argues that the district court committed no errors in the partition proceeding that require a de novo review, in awarding interest as of the date of judgment to Ms. DiMarco, or in granting her attorney fees and costs. In the event that this court overturns the judgment of October. 31, 2011, nullifying the consent judgment, Ms, DiMarco ■ appeals the judgment of August 22, 2008, arguing that the trial court erred in granting Mr, Blake’s exceptions of no cause of action and res judicata because the consent judgment was not an extra-judicial judgment due to the trial court’s lack of involvement in the matter other than signing the Consent Judgment submitted by counsel prior to trial and,- therefore, the community partition was subject to a claim of lesion. Applicable and Relevant Law To nullify a judgment, the litigant must establish that (1) the circumstances surrounding the judgment at issue show that the litigant was deprived of legal rights; and (2) it would be both unconscionable and inequitable to enforce the judgment at issue. Schiff, 2015-0340 at p. 3; 177 So.3d at 722 (citing Wright v. Louisiana Power & Light, 06-1181, p. 12 (La. 3/9/07), 951 So.2d 1058, 1067) (deprivation of legal rights is “conduct which prevents an opposing party from having an opportunity tó appear or present a defense”). Because the purpose of a nullity action is to prevent injustice rather than provide the proverbial second bite I i3of the apple, when the basis of the nullification claim is that the other party withheld evidence; ¿vi-dence th.at could have been discovered by the party seeking to nullify the judgment cannot support nullification because mere failure to disclose information is not, of itself, fraud or ill practice. See Gladstone v. American Auto. Ass’n, 419 So.2d 1219, 1223 (La. 1982); see also Wright, 2006-1181 at p. 19, 951 So.2d at 1072 (“where a party seeks to annul a judgment because the other party failed to disclose facts within his knowledge or things within his possession that would have been helpful to his case, that party cannot prevail when with reasonable diligence he could have ascertained those facts himself.”). Rather, the determination of fraud or ill- practice must be made in context of the surrounding circumstances and in light of the nature of the information at issue. Specifically: ■ ... A party is not obliged to produce evidence favorable to the opponent or to present the opponent’s version . of the case, and the failure to disclose all information on the issue is not ill practice unless concealment or deceit is involved. Moreover, a party may present only his version of the occurrence, as long as he does not use false or perjured testimony or forged documents. Gladstone, supra. Pursuant to La. Code Civ. Proc. art. 2004, a nullity action based on fraud or ill practices “must be brought within one year of discovery” by the party seeking to annul a judgment. La. Code Civ. Proc. art. 2004(B). It is the knowledge of the facts, not knowledge of the legal consequences of the facts, that “commences the running” of the time period. Succession of Albritton, 497 So.2d 10, 12 (La. App. 4 Cir. 1986). Constructive notice sufficient to “excite” the litigant’s attention and “put [her] on inquiry” is “tantamount to knowledge or notice of everything to which inquiry may lead” and“[i]n the absence of fraud or concealment, a plaintiff sj^mere ignorance of [her] rights will not toll the statute of limitations.” Bellamy v. Janssen, 477 So.2d 928, 930 (La. App. 4 Cir. 1985) (citations omitted). Discussion The first issue that must be addressed is whether Ms. DiMarco’s attempt to nullify the Consent Judgment was timely filed or whether, at the time she- filed her Petition for Lesion, the nullity action had already been perempted. The point at which Ms. DiMarco’s attention was “excited” and, thus, when the applicable time period began must be determined within the context of the circumstances of this case, particularly the interaction of the parties and their attorneys in the period leading up to the Consent Judgment of June 30, 2006. Ms. DiMarco and Mr.,Blake were married for sixteen months and throughout the divorce proceedings were represented by highly experienced, competent attorneys. The discovery process was thorough and focused on the two major assets at issue in the community property, partition: the matrimonial domicile and the Blake 505. Both parties were recorded as owners of the property but the matrimonial domicile was indisputably purchased solely by Mr. Blake’s funds shortly before the marriage. Blake Offshore Drilling was formed just weeks prior to termination of the community; Ms. DiMarco was never involved personally or financially in the creation, funding, or operation of Blake Offshore Drilling or its subsequent purchase (after the community was terminated) and potential sale of the Blake 505. Nonetheless, as indicated by her claim during the discovery process that she owned fifty per cent of Mr. Blake’s ownership interest in the oil rig. Ms. DiMarco was clearly award of her interest in the Blake 505 and its sale. In this context, it is highly improbable that the information Mr. Blake had sold an oil rig | ai for a substantial amount would fail to excite Ms. DiMarco’s attention and put her “on inquiry.” That her neighbor’s report did, in fact, prompt an investigation into the sale of the Blake 505 is evidenced by Mr. Lowe’s letter of September 18, 2006, inquiring as to whether the oil rig sold by Mr. Blake for $24,000,000.00 was the former “community entity.” Notably, although Ms. DiMarco’s neighbor apparently only related that an oil rig been sold by Mr. Blake for a “substantial” amount, the letter of September 18 reveals that by that date Ms. DiMarco and/or her attorney had sufficiently investigated the matter to determine the actual sale price of the Blake 505. Also, as indicated in the correspondence between Mr. Lowe and Mr. Kingsbery, the details necessary to track the sale and disposition of the Blake 505 were—and had always been—contained in the documents previously received from the Whitney Bank during discovery. Likewise, the expert (Dave Sanderson) retained for the nullity action by Ms. DiMarco to investigate the sale of the Blake 505 was same expert consulted (and purportedly, but not actually, retained) during the discovery process to conduct an | ^independent appraisal of the Blake 505 on behalf of Ms. DiMarco. Thus, while Mr. Blake’s deposition testimony regarding the valuation of the Blake 505 was less than forthcoming—in re sponse to questioning, he avoided placing a specific value on the rig, referring to the Whitney appraisal, refurbishing estimates, and using other avoidance techniques; similarly, with regard to specific questions on the potential sale of the oil rig, he avoided giving direct answers as to potential sales—there is no evidence that Mr. Blake directly lied or perjured himself. His testimony, while evasive, must be considered in the context of the repeated assurances by Ms. DiMarco’s counsel that an independent expert had been retained and would be making an independent appraisal of the Blake 505 on behalf of Ms. DiMarco. There is nothing in the record indicating that Mr. Blake barred Ms. DiMarco’s expert from appraising the Blake 505 and, as indicated in the subsequent Lowe/Kings-bery correspondence, Ms. DiMarco had in her possession at all times the pertinent information needed to investigate the value and disposition of the Blake 505. Because Ms. DiMarco could have ascertained the value of the Blake 505 and the likelihood of a quick sale, her' decision to propose a compromise settlement agreement without doing so (ie.,' due diligence) is not a basis for nullification of the Consent Judgment agreed to by the parties. See also La. Civ. Code art. 3080 (“A compromise precludes the- parties from bringing a subsequent action based upon the matter compromised.”). La. Civ. Code art. 3082 (compromise may be rescinded for error, fraud, and other grounds for the annulment of contracts but cannot be rescinded on the grounds of lesion); see also Hymel v. Eagle, 2008-1287, p. 9 (La. App. 4 Cir. 3/18/09), 7 So.3d 1249, 1256 (“A compromise may not be rescinded for lesion, i.e., a compromise may not be rescinded because it is later determined that the bargain struck was a poor one, citing La. Civ. Code art. 3082). Notably, the record does not support a finding that Ms. DiMarco was deprived of substantial legal rights under Consent Judgment of June 30, 2006. Her decision may have been different had she obtained an independent appraisal of the Blake 505, but she cannot attack Mr. Blake for withholding information that she (with due diligence) could have uncovered herself. Although Mr. Blake’s testimony was purposefully oblique, there is no evidence that he deceitfully concealed or forged documents during the discovery process. There was no formal agreement to sell the Blake 505 until after he agreed to Ms, DiMarco’s proposed settlement and, thus, we cannot say that Mr. Blake’s failure to be fully forthcoming ^constitutes an ill practice sufficient to undermine the consent judgment. See Gladstone, supra. As the Louisiana Supreme Court has repeatedly warned, if litigants. are allowed to attack judgments as fraudulent based on an opposing party’s failure to disclose certain facts within his knowledge when the facts could have been ascertained by the attacking party through the exercise of reasonable diligence, there will be “no finality to a judgment.” First Nat’l Life Ins. Co. v. Bell, 174 La. 692, 141 So. 379, 381 (1932); Gladstone, 419 So.2d at 1226 (citing First Nat’l Life Ins. Co. v. Bell). Moreover, the Consent Judgment (proposed and drafted by Ms. DiMarco’s counsel was signed by the district court in the absence of Mr. Blake at Ms. DiMarco’s behest. 'Accordingly, the agreement was not imposed upon Ms. DiMarco and, while in retrospect, it may not appear favorable to her, at the time she agreed .to it, there was no financial certainty in the outcome of the community property partition related to the short-lived marriage. See McDaniel v. McDaniel, 567 So.2d 748, 750 (La. App. 2 Cir. 1990) (consent judgment is “a bilateral contract” that allows the parties to “adjust their differences by mutual consent and thereby put- an end to' a lawsuit with each party balancing the hope of gain against the fear of loss); DeSoto v. DeSoto, 694 So.2d 1043( La. App. 5 Cir. 1997) (consent judgment may also have the nature of a compromise); La. Civ. Code art. 3071 (“[a] compromise is a contract whereby the parties, through concessions made by one or mox-e of them, settle a dispute or an uncertainty concerning' an obligation or other legal relationship”); see also Hymel, 2008-1287 at p. 4 (La. App. 4 Cir. 3/18/09), 7 So.3d at 1252 (compromises are favored in- the law and the burden of proving the invalidity of a compromise is on party attacking it) .(citations omitted). Rather, Mr, Blake had clearly indicated that he considered the | ^matrimonial domicile to be his separate property and intended to contest the issue at the. forthcoming community property partition trial. In addition, Ms. DiMarco was being sued for financial contribution to the capital costs and maintenance of the Blake 505. In this context, the proposed settlement agreement made on her behalf seems quite reasonable and not inequitable or uncon- Conclusion A review of the record indicates that the peremptive period in this matter began when Ms. DiMarco learned of the sale of the Blake 505 in “late summer” 2006—or, at the very least, by September 18, 2006, when her counsel dispatched the letter seeking confirmation that the “community entity” (the Blake 505) had sold for $24,000,000,00. Therefore, when Ms. DiMarco filed her action to, nullify the Consent Judgment in October 2007, the applicable peremptive period had expired. Accordingly, we reverse the district court judgment of October 31, 2011, and vacate the district court judgment of June 2, 2016, each party to bear its own costs. Further discussion of the other assignments of error is pretermitted. REVERSED., .In January 2006, Ms. DiMarco’s motion to be allowed to revert to her maiden name was granted. It was also decreed in the consent judgment signed on June 30, 2006, that Ms. DiMarco would revert to her maiden name. Accordingly, in this opinion she will be referred to by her chosen name. . Ms. DiMarco’s petition, filed in the 25th Judicial District for the Parish of Plaque-mines, was docketed as case No. 52-479. . Mr. Blake testified at his deposition that he purchased the matrimonial.domicile property in Belle Chasse solely with his own funds prior to the marriage, placing Ms. DiMarco’s name on the act of sale and property deed with the understanding that Ms. DiMarco would sign a prenuptial agreement acknowledging the purchase valuation of the property as his . separate property. He conceded, however, that the marriage went forward and her name remained on the property deed even after Ms. DiMarco refused to sign the prenuptial agreement. . Blake Offshore Drilling Company, L.L.C. and Michael E. Blake v. Alicia DiMarco Blake, 25th Judicial District Court, docket No. 53-170, division "B.” . Mr, Blake conceded that, due primarily to the increase in the price of oil and the value of oil rigs between November 2003 and March 2005, his net worth increased dramatically in that time period from nineteen million dollars to sixty-seven million dollars. . There was some dispute as to the timing of the gift; Mr. Blake remembered it as a Christmas present, Mr. Lowe pointed out the check was written in February 2005. . In an answer to Interrogatory No. 11, propounded on August 25, 2008, by counsel for Mr. Blake related to Ms. DiMarco’s Petition for Lesion, Ms. DiMarco revealed that’ Mr, Sanderson was consulted on April 16, 2006, but he was not retained until October 2006 and never performed an independent appraisal. ' • . 'Ms. DiMarco filed.a "Request for Emergency Status Conference Concerning Implementation of Settlement” and, after a hearing on June 27, 2006, Mr. Blake was ordered in open court to sign the Consent Judgment by noon on June 30, 2006. Mr. Blake failed to sign the Consent Judgment by the deadline and the court signed it Without Mr. Blake’s signature. . This amount reflects half the purchase price of the former matrimonial domicile in -Belle Chasse. . Ms. DiMarco’s knowledge of the sale in the "late summer 2006” is attributable to subsequent responses to interrogatories dispersed during discovery related to Ms. DiMarco’s Petition for Lesion. . Pursuant to La. Code Civ. Proc. art. 2004, a nullity action for fraud or ill practices “must be asserted in a direct action, not collaterally.” See Editor's Notes (citing Comment (d)). The consent judgment in this case was nullified in the judgment of October 31, 2011, although whether Ms. DiMarco's vague assertion of fraud within her Petition for Lesion qualifies as the requisite "direct action” is problematic. However, in light of Mr. Blake’s apparent agreement that it was sufficient (urging this court not to consider the writ application because it would not resolve all issues between the parties), we make no- determination as to whether the nullity action was properly pleaded. . “Each spouse owns an undivided one-half interest in the former community property . and its fruits and products, La. Civ. Code art. 2369.2, and a spouse may not "alienate, encumber, or lease” former community property without the concurrence of the other spouse; absent such concurrence, the alienation is a relative nullity. La. Civ. Code art. 2369.4. Notably, Ms. DiMarco does not claim that the sale of the Blake 505 is null or seek to - rescind the sale, thereby implicitly conceding that, at the time of the sale, the Blake 505 was no longer community property, i.e.,, the sale took place after the community was partitioned by the terms of their compromise agreement. . In accordance with the jurisprudence of this court, appellate counsel for Mr. Blake correctly characterizes the time limitation applicable in this case (a nullity action pursuant to La. Civ. Code 2004) as peremption, not prescription. See Schiff v. Pollard, 2015-0340, p. 5 (La. App. 4 Cir. 10/7/15), 177 So.3d 719, 722-723 (2015) (Landrieu, J. concurrence): see also La. Civ. Code art. 3459 (the “provisions on prescription governing computation of time apply to peremption.”); La. Civ. Code. Art, 3460 ("[pjeremption may be pleaded or it may be supplied by a court on its own ' 'motion at any time prior to final judgment.”). As illustrated in this case, there is confusion as to whether the time limitation for bringing an action for nullity pursuant to La. Code Civ. Proc. Art. 2004 is prescriptive or peremptive; this confusion is reflected in jurisprudential inconsistencies both among the circuits and within the circuits. See Schiff v. Pollard, 2015-0340, p. 5 (La. App. 4 Cir. 10/7/15), 177 So.3d 719, 722-723 (2015), Landrieu, J. concurrence (gathering cases). As correctly characterized by Mr. Blake’s appellate counsel, pursuant to the jurisprudence of this court the time limitation in Article 2004 is one of per-emption. Id, Notably, the “provisions on prescription governing computation of time apply to peremption." La. Civ. Code art. 3459; see also La. Civ. Code. art. 3460 (peremption may be pleaded or it may be supplied by the court on its own motion at any time prior to final judgment). . This alternative theory is meritless. The judgment nullifying the consent judgment was an interlocutory ruling which may be reviewed in an appeal from a final1 judgment which, in this case, is the community partition judgment of June 2, 2016. See Schroth v. Estate of Samuel, 2011-1385, p. 4 (La. App. 4 Cir. 4/18/12), 90 So.3d 1209, 1211-12 (citation omitted); see also Roger A. Setter, LOUISIANA CIVIL APPELLATE PROCEDURE, 3:22 (2010-2011 ed.) ("When an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings adverse to him, in addition to the review of the final judgment).