h JONES, Judge.
Plaintiff/Appellant, Charmaine J. Carter, appeals the judgment of the District Court, which granted the Peremptory Exception of Prescription in favor of the defendants, New Orleans General Hospital (NOG) and Drs. William Grant and Don E. Carter. For reasons stated herein, we reverse the judgment of the District Court, and reinstate Ms. Carter’s claim.

FACTS

In 1991, Ms. Carter served 14 months in Jefferson Parish for theft. After Ms. Carter served her sentence, the criminal district court placed her in a Drug Rehabilitation Program at the New Orleans General Hospital for thirty (80) days. As part of the Drug Rehabilitation Program, Ms. Carter was required to submit to Ingroup therapy sessions and drug testing. However, once Ms. Carter was admitted to the Drug Rehab Program, she consented to an HIV test on December 10,1992.
Approximately three weeks following her test, Dr. Don E. Carter told Ms. Carter that she was HIV positive. Believing that the test results were incorrect, Ms. Carter immediately requested that Dr. Carter perform another test. One of the nurses at New Orleans General administered the second HIV test between January 1993 and February 1993. Again, Ms. Carter tested HIV positive.
Following her discharge from the Rehabilitation Program, Dr. Don E. Carter referred Ms. Carter to Dr. William Grant, who scheduled Ms. Carter for monthly visits. As part of his treatment, Dr. Grant required Ms. Carter go to the New Orleans AIDS Task Force (AIDS Task Force) for AIDS counseling, HIV testing and to have her CD4-T cell[1] count monitored. According to Ms. Carter, one of the nurses at the AIDS Task Force regularly drew her blood and scheduled her to return in a couple of days to get her blood test results. Since her referral to Dr. Grant, Ms. Carter’s CD4-T cell count has been in the thousands, which is not indicative of someone who has tested positive for AIDS. In fact, Ms. Carter’s CD4-T cell count was 1,320.[2]
In February 1994, Ms. Carter requested that a third HIV test be performed and the test results were negative. When Ms. Carter informed Drs. Carter and Grant of the negative results, they told her to take an antigen test.[3] Because Ms. Carter had to pay a $70 fee for the antigen test, she delayed taking the test until she|swas able to pay the fee. Meanwhile, the AIDS Task Force administered a second HIV test in April 1995, which came back nonreactive or negative.
Subsequently, Ms. Carter contacted an attorney who paid for the antigen test, which was performed on June 20, 1995. Again, the results were negative. On December 11, 1995, Ms. Carter filed a medical malpractice complaint with the Louisiana Patient’s Compensation Fund (PCF) against Drs. Carter and Grant and the *837 New Orleans General Hospital (collectively referred to as Defendants).
On September 16, 1996, the Defendants deposed Ms. Carter wherein she stated that it was not until June 1995 that she learned that she did not have the AIDS virus. Defendants filed a joint Peremptory Exception of Prescription on May 16, 1997. Following a hearing on the exception, the district court granted the exception and dismissed Ms. Carter’s claim with prejudice. It is from this judgment that Ms. Carter filed the instant appeal.

PRESCRIPTION AND PEREMPTION

In her sole assignment of error, Ms. Carter argues that the district court erred in granting the Exception of Prescription because her complaint had been filed within the time delays outlined in LSA-R.S. 9:5628. Moreover, Ms. Carter argues that the doctrine of contra non valentum precludes prescription from tolling against her since she was unaware of the defendants’ negligence until June 1995. Further, she argues that her ignorance of the defendants’ actions was not willful, negligent or unreasonable.
In rebuttal, the defendants contend that Ms. Carter had knowledge of her negative HIV status as far back as February 1994 when she received the first negative test results — not in July 1995 when the antigen results came back |4negative. They also contend that the grounds for her medical malpractice claim arose in March 1994— the month when she received the negative results for her HIV test from the AIDS Task Force. Finally, the defendants argue that Ms. Carter’s medical malpractice had prescribed pursuant to LSA-R.S. 9:5628 since she delayed filing her complaints until December 1995, over one year after her date of discovery of the alleged wrong. We disagree.
LSA-R.S. 9:5628(A) provides the following:
No action for damages for injury or death against any physician, chiropractor, nurse, licensed midwife practitioner, dentist psychologist, optometrist, hospital duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1299.41(A), whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be fíled at the latest within a period of three years from the date of the alleged act, omission, or neglect. (Emphasis added).
LSA-R.S. 9:5628(A) has a hybrid component — prescription and peremption. Based upon the wording of the statute, the claimant must file his lawsuit within one year of the alleged act or discovery of the act (prescription), but no more than three years from the date of the alleged act. (peremption).
Generally, prescription commences when the plaintiff has actual or constructive knowledge of the tortious act, the damage and the causal relation between the tortious act and the damage. See LeCompte v. State DHHR-So. LA. Med. Center, 97-1878 (La.App. 1 Cir. 9/25/98), 723 So.2d 474. However, mere apprehension that something is wrong will not necessarily begin the running of | .^prescription for medical malpractice actions. Baum v. Cato, 599 So.2d 909 (La.App. 4 Cir.1992).
In fact, prescription runs from the time the claimant has actual or constructive knowledge of the tortious act, and such information was sufficient to excite attention and prompt further inquiry. Nat. Council v. Quixx Temporary Services, 95-0725 (La.App. 4 Cir. 11/16/95), 665 So.2d 120, 123-124. On the other hand, the doctrine of contra non valentem suspends the running of prescription when *838 the claimant’s cause of action is not known or reasonably knowable by the claimant even though his ignorance is not induced by the defendant Wadsworth v. ABC Ins. Co., 98-0486 (La.App. 4 Cir. 12/9/98), 732 So.2d 56, writ denied, 99-0453 (La.4/1/99), 742 So.2d 558.
In Bawm, the claimant filed a medical malpractice lawsuit against the defendant/physician who surgically inserted a penile implant into him in June 1987. Despite the pain the claimant was experiencing, he continued under the defendant’s care until August 1987. In January 1990, another physician removed the implant and informed the claimant that the pain he was experiencing resulted from an penile implant which was improperly inserted. The claimant then filed suit in November 1990. The district court concluded that the claim had prescribed and dismissed the lawsuit.
In reversing the district court, this Court found that it was not reasonable to presume that the claimant knew the implant was improperly inserted until the second physician informed of such in January 1990. This Court also opined that the claimant’s continuation of treatment with the defendant did not establish knowledge of the misdiagnosis. By continuing treatment with the defendant for an | ^additional two years, this Court found that the claimant did not reasonably believe that the source of his pain was from the defendant’s negligence.
Moreover, this Court found that the claimant’s educational background was relevant in determining whether the claimant had knowledge of a defendant’s negligence. In Hoerner v. Wesley-Jensen, 95-0553 (La.App. 4 Cir. 11/20/96), 684 So.2d 508, writ denied, 96-3047 (La.2/7/97), 688 So.2d 501, the claimant filed suit against the manufacturer and the retailer for extended-wear contact lenses which ultimately caused her to develop an ulcerative kerati-tis in her right eye. Based on the representations made by the defendants, the claimant purchased a pair of extended-wear contact lenses in November 1986, and wore said lenses during the day and overnight for six months.
In May 1987, the claimant’s optometrist informed her that she had an infection in her right eye. In November 1989, the claimant read a magazine article, which showed a correlation between extended-wear contact lenses and a significantly increased risk of severe eye infections — especially if the lenses are worn overnight. Within weeks of reading the article, the claimant filed suit. The defendants subsequently filed an exception of prescription, and the district court granted the exception.
In reversing the district court’s decision, this Court found that the claimant’s cause of action did not arise until she read the magazine article, which informed her that the source of her eye infection was the extended-wear contact lenses. The Court also found that the claimant’s bachelor’s degree in medical technology did not undermine her defense of contra non valen-tem. In fact, the defendants did not present any evidence to suggest that the claimant utilized her medical knowledge or skill in performing her employment duties as a payroll and accounts payable |7clerk at a medical office. Cf. In re Medical Review Panel for Dede, 98-2248 (La.App. 4 Cir. 12/2/98), 729 So.2d 603, writ denied, 99-0531 (La.4/9/99), 740 So.2d 634.
Likewise, in the instant case, we find that the circumstances surrounding Ms. Carter’s claim proves that her cause of action did not commence to run until June 1995. Like Hoemer and Baum, we find that Ms. Carter’s actions indicated that she was confident that her doctor’s original diagnosis was correct. The fact that she continued treating with Drs. Carter and Grant after the third HIV test results proved negative establishes that Ms. Carter was not totally convinced that the original test results in December 1992 were false. Moreover, when Ms. Carter received the results from her February 1994 *839 test, she immediately sought clarification of the conflicting test results. Rather than explain the results of the test to her, the defendants immediately discounted the credibility of the February 1994 test and recommended that she take an antigen test.
Having only a 10th grade education, Ms. Carter did not have any reason to doubt her treating physician’s diagnosis based on the fact that her doctors had the expertise to decipher medical testing results. Therefore, Ms. Carter complied with her physicians’ orders and took the antigen test in June 1995 — after her attorney agreed to sponsor the test. Once the antigen test proved that Ms. Carter did not have the AIDS virus, she then had strong suspicions about the accuracy of the December 1992 test. Thus, it was in June 1995 that the prescription clock started running on Ms. Carter’s claim. In Hoer-ner, the magazine article gave rise to the plaintiffs cause of action against the manufacturer. However, in the instant case, it was the results from the antigen test that alerted Ms. Carter of the possibility that the December 1992 test was incorrect; thereby establishing her cause of action.
1 sHaving found that the doctrine of contra non valetem actually suspended prescription until June 1995, we find that the filing of Ms. Carter’s complaint on December 11, 1995 was timely. Moreover, the record reflects that the first HIV test was taken on December 10, 1992, but the results were not received until January 1993. Therefore, pursuant to LSA-R.S. 9:5628, Ms. Carter actually had until January 1996 (three years from the date of the alleged act) to filed her claim. Accordingly, the district court’s judgment is reversed and the ease is remanded for further proceedings.

DECREE

For the foregoing reasons, we reverse the district court’s judgment granting the Peremptory Exception of Prescription, and remand for further proceedings.

REVERSED AND REMANDED.

. T cell monitoring allows the physician to measure the severity of HIV disease, which is the precursor of AIDS. A low CD4-T cell count indicates that the patient has a greater chance of contracting an infection.

. The normal CD4 T-cell count in a healthy person ranges anywhere from 500 to 1,500.

.The antigen is a foreign substance that is capable of adhering to lymphocytes, which are the body’s infection fighting white blood cells. Once the antigen is injected into the body, it causes the lymphocytes to produce antibodies to combat the antigen. If the antigen is not totally consumed by the antibodies, then the person is presumed to have the AIDS virus.