DWAYNE ALEXANDER     *     NO. 2020-CA-0321

VERSUS     *

    COURT OF APPEAL

WAYNE R. CENTANNI,     *
INDIVIDUALLY AND D/B/A     FOURTH CIRCUIT
CENTANNI INVESTIGATIVE     *
AGENCIES, AND DAVID     STATE OF LOUISIANA
PARNELL, JR.     * * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2015-00209, DIVISION "N-8"
Honorable Ethel Simms Julien, Judge
* * * * * *
**Judge Daniel L. Dysart**
* * * * * *
(Court composed of Judge Roland L. Belsome, Judge Daniel L. Dysart, Judge Joy Cossich Lobrano)

Robert G. Harvey, Sr.
LAW OFFICE OF ROBERT G. HARVEY, SR., APLC
600 N. Carrollton Avenue
New Orleans, LA 70119
      COUNSEL FOR PLAINTIFF/APPELLANT

Thomas G. Buck
Brett W. Tweedel
BLUE WILLIAMS, L.L.C.
3421 N. Causeway Blvd., Suite 900
Metairie, LA 70002-3760

Michael Don Peytavin
Andrew C. Blasini
GAUDRY RANSON HIGGINS & GREMILLION, L.L.C.
401 Whitney Avenue, Suite 500
Gretna, LA 70056

Dennis J. Phayer
BURGLASS & TANKERSLEY, L.L.C.
5213 Airline Drive
Metairie, LA 70001-5602
        COUNSEL FOR DEFENDANT/APPELLEE


**AFFIRMED**

**JANUARY 27, 2021**

*DLD*
*RLB*
*JCL*

This appeal concerns trial court judgments granting peremptory exceptions of prescription and dismissing the claims of plaintiff, Dwayne Alexander, against the defendants, Wayne R. Centanni, Centanni Investigative Agency, Inc., David Parnell and James Englade (collectively referred to herein as "defendants"). For the reasons that follow, we affirm the trial court's judgment.

**FACTS AND PROCEDURAL HISTORY**

This matter is the latest in a number of lawsuits and appeals filed by Mr. Alexander, a private investigator, arising from or connected to his claims that defendant, Wayne Centanni, individually and d/b/a Centanni Investigative Agency, engaged in conduct the intended purpose of which was to drive him out of business.[1]

By way of background, Mr. Alexander held a license to work as a private investigator from 1996 to November 14, 2006, when Mr. Alexander's license

---

[1] Indeed, this Court noted in *Alexander v. Louisiana State Bd. of Private Investigator Examiners*, 19-0778, p. 21 (La. App. 4 Cir. 4/1/20), 293 So.3d 1243, 1257, *writ denied*, 20-01072 (La. 11/10/20), 303 So.3d 1039 that Mr. Alexander filed at least twenty "similar and indirectly related lawsuits."

expired.[2]  After that date, Mr. Alexander was engaged in the investigation of worker's compensation claims for the City of New Orleans, through its third party claims administrator, Cannon Cochran Management Services, Inc. ("CCMSI"), work he had begun performing in 2000, while his license was still valid.[3]

Prior to the expiration of his license, Mr. Alexander received notice from the Louisiana State Board of Private Investigator Examiners (the "Board") that two complaints of professional misconduct had been made against him, which the Board was investigating.[4]  The Board also notified Mr. Alexander that he "'may have violated state criminal law during one of those investigations' and that the matter would be turned over to the State Police for investigation."[5]

In February, 2009, Mr. Centanni sent the Board a complaint against Mr. Alexander, in which he alleged that Mr. Alexander was performing the work of a private investigator without a license and requesting an investigation.[6]  The complaint included a large binder of documents containing personal and professional information Mr. Centanni had compiled from various sources, including documents received from the Board pursuant to a public records request.[7] The binder contained information regarding Mr. Alexander's license and his expunged criminal convictions.[8]

Mr. Centanni also sent the complaint and the binder to various others, including the CCMSI, the Metropolitan Crime Commission ("MCC"), and a

---

[2] *See Alexander v. La. State Bd. of Private Investigator Examiners*, 15-0537, p. 2 (La. App. 4 Cir. 2/17/17), 211 So.3d 544, 550, *writ denied*, 17-0571 (La. 5/26/17), 221 So.3d 855, and *writ denied*, 17-0607 (La. 5/26/17), 221 So.3d 857 ("*Alexander I*").
[3] *Id.*, p. 2, 211 So.3d at 549-550.
[4] *Id.*, p. 3, 211 So.3d at 550.
[5] *Id.*
[6] *Id.*, p. 4, 211 So.3d at 550.
[7] *Id.*
[8] *Id.*

2

television reporter.[9]  In February, 2009, the CCMSI terminated its contract with

Mr. Alexander and the Board sent Mr. Alexander a cease and desist letter, ordering

that he cease and desist the practice of private investigation.[10]

In 2011, while Mr. Alexander was working for the St. Charles Parish School

Board investigating a worker's compensation matter, an anonymous tip was made

to the MCC reporting that Mr. Alexander was working as a private investigator

without a license.[11]  The MCC then reported this information, along with

information regarding Mr. Alexander's criminal background, to the Superintendent

of the School Board.[12]  A cease and desist order was issued to Mr. Alexander and

the Superintendent contacted the St. Charles Parish Sheriff's Office ("SCPSO")

requesting that it look into whether, in fact, Mr. Alexander was working as a

private investigator without a license.[13]  The SCPSO then contacted the Board for

information about Mr. Alexander and the relevant statutes on the subject; Mr.

Englade responded by advising that the Board had issued a cease and desist letter

to Mr. Alexander in 2009, which was still in effect.[14]

Based on the information provided by the Board, in June, 2011, the SCPSO

issued a warrant for Mr. Alexander's arrest for violating La. R.S. 37:3520, the

statute that criminalizes the provision of private investigative services without a

license.[15]  Mr. Alexander learned of the arrest warrant and turned himself in to the

---

[9] *Id.*
[10] *Id.*, p. 5, 211 So.3d at 551.
[11] *Id.*, p. 6, 211 So.3d at 551.
[12] *Id.*
[13] *Id.*
[14] *Id.*, pp. 6-7, 211 So.3d at 552.
[15] *Id.*, p. 7, 211 So.3d at 552.

police.[16]  Mr. Alexander's arrest was published in the Times-Picayune newspaper the following day.[17]

Over the years, Mr. Alexander filed several lawsuits, including a 2009 suit against Mr. Centanni and Centanni Investigative Services in which he alleged unfair trade practices claims.  During the course of that lawsuit, the defendants filed a special motion to strike pursuant to La. C.C.P. art. 971,[18] which was granted by the trial court.[19]  While Mr. Alexander appealed an award of attorney's fees and costs under Article 971, he did not appeal the judgment granting the special motion to strike.[20]  These events led to the lawsuit at issue in *Alexander I*, a lawsuit that ended in a favorable jury award to Mr. Alexander.

On January 9, 2015, Mr. Alexander filed the instant action against Mr. Centanni, his agency, and David Parnell, an attorney who represented them in connection with the 2009 lawsuit.  In his Petition to Annul Judgment for Fraud and Ill Practice Pursuant to C.C.P. art. 2004 ("nullity petition"), Mr. Alexander sought to have the judgment granting the motion to strike in *Alexander II* annulled on the basis that "it was based on perjured testimony and constitutes fraud and ill practice under C.C.P. art. 2004."  He further alleged that the judgment prevented him from "participating in a fair and impartial proceeding and denying him the opportunity

_____

[16] *Id.*, p. 8, 211 So.3d at 552.
[17] *Id.*
[18] La. C.C.P. art. 971 A(1) provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim."
[19] *Alexander v. Centanni*, 11-0783, p. 2 (La. App. 4 Cir. 11/16/11), 80 So.3d 590, 591 ("*Alexander II*").
[20] *See Alexander II*.  Special motions to strike were granted in other matters filed by Mr. Alexander, which were affirmed by this Court on appeal.  *See Alexander v. Times-Picayune L.L.C*, 16-1134 (La. App. 4 Cir. 5/31/17), 221 So.3d 198, 201, *writ denied sub nom. Alexander v. Times-Picayune L.L.C.*, 17-1322 (La. 11/6/17), 229 So.3d 469; *Alexander v. Louisiana State Bd. of Private Investigator Examiners*, 19-0778, p. 15, 293 So.3d at 1254.

4

to appear and assert his claim as provided for by the Louisiana Constitution, Article 1, Section 22." More specifically, Mr. Alexander alleged that Mr. Parnell, acting in concert with James P. Englade, the Board's executive director, "create[d], fabricate[d] and present[ed] perjured, testimony, false documents, and misrepresented facts to the Court by way of affidavit, exhibits and memorandum, related to material issues involving" Mr. Alexander's 2009 suit. The alleged falsity pertained to an affidavit executed by Mr. Englade that was used by the defendants in *Alexander II* in support of their special motion to strike, in addition to testimony given by Mr. Englade in a deposition and in the 2014 trial in *Alexander I*.

Asserting the doctrine of *contra non valentem*, Mr. Alexander alleged that he first had knowledge of the alleged "perjured testimony and evidence of fabrication of documents" some time between January 9, 2014 and December 16, 2014, which is within a year before the filing of this action.

Mr. Alexander amended his Petition on July 23, 2015, adding Mr. Englade as a defendant.

In response to the nullity petition, Mr. Centanni filed a peremptory exception of prescription on July 8, 2019. Mr. Englade joined in Mr. Centanni's exception on July 11, 2019. Centanni Investigative Agency filed its own exception of prescription on October 21, 2019. Mr. Centanni's and Mr. Englade's exceptions were heard by the trial court on October 4, 2019. By judgment dated November 4, 2019, the trial court granted the exception, dismissing the claims against Mr. Centanni, Mr. Parnell and Mr. Englade.[21] A separate judgment granting the

---

[21] We note that, while exceptions of prescription were filed by Mr. Centanni and Mr. Englade, the record does not contain an exception of prescription filed by or on behalf of Mr. Parnell. Nor

exception as to Centanni Investigative Agency was rendered on December 16, 2019.

Mr. Alexander filed motions for new trial on November 12, 2019 as to the November 4, 2019 judgment and on December 27, 2019 as to the December 16, 2019 judgment. The motions were heard together and denied by the trial court by judgment dated February 14, 2020. Mr. Alexander filed an appeal of the February 14, 2020 judgment on February 28, 2020.

**DISCUSSION**

At the outset, and as noted by defendants, the appeal of this matter is of the February 14, 2020 judgment denying Mr. Alexander's motions for new trial rather than the judgments granting the exceptions of prescription. Generally, a judgment denying a motion for new trial is an interlocutory, non-appealable judgment. *Barham, Warner & Bellamy, L.L.C. v. Strategic All. Partners, L.L.C.,* 09-1528, p. 4 (La. App. 4 Cir. 5/26/10), 40 So.3d 1149, 1151. In his appellate brief, however, Mr. Alexander does not address the issue of the trial court's denial of his motion for new trial. His sole assignment of error pertains to the grant of the exceptions of prescription.

Our jurisprudence reflects that "courts have consistently considered an appeal of the denial of a motion for new trial as an appeal of the judgment on the merits, when, as here, it is clear from the appellant's brief that the intent is to appeal the merits of the case." *Wiles v. Wiles*, 15-1302, p. 3 (La. App. 4 Cir.

---

did counsel appear for Mr. Parnell at the November 4, 2019 hearing on the exceptions. However, because we have found that the exceptions are meritorious as to the other defendants, they are meritorious as to Mr. Parnell as well. We note, too, that "prescription can be raised by a party for the first time on appeal." *Loughlin v. United Servs. Auto. Ass'n,*, 17-0109, p. 14 (La. App. 4 Cir. 12/20/17), 233 So.3d 132, 142. Furthermore, an appellate court is empowered to "render any judgment which is just, legal, and proper upon the record on appeal." *Wooley v. Lucksinger*, 09-0571, p. 63 (La. 4/1/11), 61 So.3d 507, 563.

5/18/16), 193 So.3d 397, 398. *See also Edgefield v. Audubon Nature Inst., Inc.,* 18-1782, p. 1 (La. 1/18/19), 261 So.3d 776; *Clotworthy v. Scaglione*, 11-1733, p. 3 (La. App. 4 Cir. 5/23/12), 95 So.3d 518, 520. Accordingly, while Mr. Alexander did not expressly appeal the judgments granting the exceptions of prescription, it is clear that his intent was to appeal these judgments and we focus exclusively on this issue rather than the denial of Mr. Alexander's motion for new trial.[22]

Mr. Alexander's nullity action was brought pursuant to La. C.C.P. art. 2004, which, under subpart A, provides that "[a] final judgment obtained by fraud or ill practices may be annulled." A suit to annul a judgment based on fraud or ill practices must be brought "within one year of the discovery by the plaintiff . . . of the fraud or ill practices." La. C.C.P. art. 2004 B. "It is the knowledge of the facts, not knowledge of the legal consequences of the facts, that 'commences the running' of the time period." *Blake v. Blake*, 16-1196, p. 19 (La. App. 4 Cir. 9/20/17), 228 So.3d 223, 236, *writ denied*, 17-2057 (La. 3/23/18), 239 So.3d 297. Actual knowledge is not necessary; "as long as there is constructive notice." *Bayou Fleet, Inc. v. Bollinger Shipyards, Inc.*, 15-0487, p. 13 (La. App. 4 Cir. 7/21/16), 197 So.3d 797, 806. "Knowledge sufficient to start the running of prescription is 'constructive knowledge,' or the 'acquisition of sufficient information, which, if pursued, will lead to the true condition of things.'" *Id.* (citation omitted). "The ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct." *Id.* (citation omitted).

_____

[22] Having failed to brief the issue of the denial of the motion for new trial that issue has been waived and is not before the Court. *See*, *e.g.*, *McMaster v. Progressive Sec. Ins. Co.*, 14-0155, pp. 6-7 (La. App. 4 Cir. 10/29/14), 152 So.3d 979, 983.

7

In the instant matter, Mr. Alexander's nullity petition was filed almost five years after the motion to strike was granted in *Alexander II*. However, the nullity petition does not show on its face that it was prescribed insofar as Mr. Alexander asserted the defense of *contra non valentem*, by stating:

> Plaintiff pleads the doctrine of contra non valentem, alleging that all of the perjured testimony and evidence of fabrication of documents attached to the defendants' motion to strike heard April 23, 2010, was discovered between January 9, 2014 and December 16, 2014 as pled herein.

The defendants maintain that the doctrine of *contra non valentem* is inapplicable to the facts of this case, and as such, Mr. Alexander's claims are prescribed.

Our jurisprudence on the burden of proof on a peremptory exception of prescription and the standard of review applied by appellate courts is well-settled. This Court reiterated the applicable principles in *Boulmay v. Heebe*, 17-0638, pp. 3-4 (La. App. 4 Cir. 12/27/17), 238 So.3d 459, 462, *writ denied*, 18-0193 (La. 3/23/18), 239 So.3d 299 (quoting *Ames v. Ohle*, 11-1540, pp. 5-6 (La. App. 4 Cir. 5/23/12), 97 So.3d 386, 390-91) as follows:

> Ordinarily, a party asserting a peremptory exception of prescription bears the burden of proof. *Trust for Melba Margaret Schwegmann v. Schwegmann*, 09-968, p. 8 (La. App. 5 Cir. 9/14/10), 51 So.3d 737, 742. However, if prescription is evident from the face of the pleadings, the plaintiff will bear the burden of showing an action has not prescribed. *Id*. If evidence is introduced at the hearing on the peremptory exception of prescription, the district court's findings of fact are reviewed under the manifest error-clearly wrong standard of review. *Rando v. Anco Insulations, Inc.*, 08-1163, p. 20 (La. 5/22/09), 16 So.3d 1065, 1082. If there is [ ] an absence of evidence, the exception of [ ] prescription must be decided upon the properly pleaded material allegations of fact asserted in

8

the petition, and those alleged facts are accepted as true. *Trust for Melba Margaret Schwegmann*, 51 So.3d at 742.

The doctrine of *contra non valentem*, upon which Mr. Alexander relies, "is a jurisprudentially-created, 'limited exception [to prescription] where in fact and for good cause a plaintiff is unable to exercise his cause of action when it accrues.'" *Ramos v. Le*, 18-0677, p. 5 (La. App. 4 Cir. 12/12/18), 261 So.3d 959, 963, *writ denied*, 19-0067 (La. 3/6/19), 266 So.3d 906 (quoting *Corsey v. State, Through Dep't of Corr.*, 375 So.2d 1319, 1321 (La. 1979)). In other words, "the running of prescription is suspended [under the doctrine of *contra non valentem*] when certain factual circumstances exist, one of which is when the cause of action is not known or reasonably knowable by the plaintiff even though his ignorance has not been induced by the defendant." *Wilhike v. Polk*, 08-0379, p. 3 (La. App. 4 Cir. 11/19/08), 999 So.2d 83, 85. However, as we noted in *Ramos*, the doctrine applies only in "exceptional circumstances." *Ramos*, 18-0677, p. 6, 261 So.3d at 963 (quoting *Renfroe v. State ex rel. Dep't of Transp. & Dev.*, 01-1646, p. 9 (La. 2/26/02), 809 So.2d 947, 953).

We recognize that, in reviewing a peremptory exception of prescription, appellate courts are to strictly construe the statutes against prescription and in favor of the claim. *Rando*, 08-1163, p. 20, 16 So.3d at 1083. However, under the circumstances of this case, we find no manifest error in the trial court's finding that this matter has prescribed and that Mr. Alexander's claims are not saved by the doctrine of *contra non valentem*.

The main focus of this case is on the affidavit of Mr. Englade that was used to support the special motion to strike in *Alexander II*. Mr. Alexander maintains that Mr. Englade's affidavit "was intentionally drafted with inaccuracies to get the

underlying . . . case [*Alexander II*] dismissed." These inaccuracies, Mr. Alexander submits, were unknown to him until Mr. Englade was deposed in connection with the *Alexander I* lawsuit on January 9, 2014, exactly a year before he instituted this action on January 9, 2015.

The trial court rejected Mr. Alexander's arguments, issuing lengthy and detailed Reasons for Judgment, essentially finding that Mr. Alexander "admit[ted] that he knew of defendants' alleged wrong-doing well over a year before he filed [this] suit." We agree.

Mr. Englade's affidavit contained thirteen points, several of which simply set forth the duties of the Board and its responsibilities with respect to complaints made to it about conduct of private investigators.[23] As specifically concerns Mr. Alexander, the affidavit can be summarized as providing the following attestations from Mr. Englade:

- Two written complaints were filed against Mr. Alexander in 2006, one of which suggested that Mr. Alexander was guilty of filing a false public record (billing for services done in violation of a contract), and while investigations were initiated as to both, neither were completed.

- The Board sent correspondence to Mr. Alexander on December 6, 2006 advising that neither complaint was resolved, that Mr. Alexander's license had expired in November 2006 and would not be renewed and Mr. Alexander "may have violated state criminal law during one of those investigations", and mentions referral for criminal investigation; the Board "contacted criminal authorities concerning its findings and considered jurisdiction over the matter transferred to other law enforcement authorities.

- The Board attempted to send a cease and desist letter to Mr. Alexander dated February 27, 2009, "but there was no further communications with" him and he was believed to have left the area; thus, the two complaints had been closed, at which time Mr. Englade noted in "Dwayne Alexander's file that 'he is not eligible to conduct private

---

[23] We note, as did the trial court that the affidavit contains the month of March and the year 2010, but does not state the date on which it was executed.

10

investigator work in this state' because he did not hold a private investigator license."

- After receiving the complaint from Mr. Centanni, the Board sent a cease and desist letter to Mr. Alexander "concerning the 2006 matters." Additionally, the Board "began an administrative enforcement action concerning whether the services being provided by [Mr. Alexander] . . . for CCMSI [violated licensing laws];" CCMSI had reported to the Board that Mr. Alexander was not its employee but worked through his employer as an independent contractor.

- The Board had no information that would exempt Mr. Alexander from the licensing requirements for work done in 2009.

The nullity petition, alleging that the affidavit contains "fabricated, unauthorized and contained perjured testimony" is rather rambling but centers on the following allegations. First, Mr. Alexander submits that, in his deposition, Mr. Englade "only vaguely remembered the affidavit," could not recall when or where it was signed and could not recall whether he or someone else prepared it. Of course, Mr. Englade had signed the affidavit almost four years before his deposition was taken. Mr. Alexander likewise suggests impropriety with the affidavit because, although it was signed by Mr. Englade in March, 2010, and attached to his 2014 deposition, there is another affidavit stamped into the CDC records on January 23, 2010, something Mr. Englade was unable to explain. Neither of these allegations suggest the misrepresentations and fraud in the content of the affidavit as alleged by Mr. Alexander.

Moreover, while the affidavit stamped with the January 23, 2010 date was attached as an exhibit to the nullity petition, its provenance is unclear. The special motion to strike, also attached as an exhibit to the nullity petition, has Mr. Englade's affidavit as an exhibit. It has no date stamp on it. Had the affidavit been filed into the record on January 23, 2010, this fact should have been known to Mr. Alexander at that time. At the least, given that the special motion to strike was

11

filed in March, 2010, months after the date stamped of January 23, 2010, Mr. Alexander should have been on notice of a discrepancy in the dates, which "was sufficient to excite attention and prompt further inquiry." *Carter v. Grant*, 97-2106, p. 5 (La. App. 4 Cir. 10/25/00), 772 So.2d 835, 837.

Mr. Alexander then contests certain statements contained in the affidavit as fabricated, false and perjured. First, he contends that the information contained in the 2006 letter to him were fee disputes "and could not have resulted in a cease and desist order because at the time of the complaints, Alexander was licensed," as acknowledged by Mr. Englade in his 2014 deposition. Thus, he argues, "any reference in the affidavit that the cease and desist order of February 27, 2009 was related to these two matters, is perjured testimony."

We first note that the 2009 letter and the cease and desist order accompanying the letter make no reference to the 2006 complaints against Mr. Alexander. To the contrary, both simply state that the Board found that he was "engaged in the practice of private investigative work in the State of Louisiana and [was] not licensed as such," ordering that he cease and desist "the prohibited activity."

It is clear that in 2006, Mr. Alexander was aware of the nature of the two complaints against him made in 2006. The December 6, 2006 letter to him states:

> You have received a letter of notice and were also
> present at the board office to discuss one of the
> complaints on October 2, 2006. You were advised to
> attempt to reconcile these complaints as soon as possible.
> As of this date, you failed to reach any compromise with
> either party.

That Mr. Alexander allegedly only learned in 2014 that the 2006 complaints could not form the basis of a cease a desist order (based on his working as a private

investigator without a license) is disingenuous. At a minimum, the 2010 affidavit's suggestion that the cease and desist order issued was issued as a result of the complaints in 2006 (which, according to Mr. Alexander were "fee disputes") should have put Mr. Alexander on notice in 2010 that there was an issue with respect to that statement in the affidavit.

Moreover, as the trial court found, Mr. Alexander filed suit against the Board in 2013 (*Alexander I*) in which he asserted the invalidity of the cease and desist orders. In addition to the invalidity of the cease and desist orders, the trial court noted that Mr. Alexander "accuse[d] the Board of doing no investigation when it received the two complaints in 2005-2006 prior to issuing the cease and desist order;" and, failing to investigate Mr. Centanni's complaint and instead "choosing to issue a second cease and desist order on closed matters without identifying the reasons why the cease and desist orders were issued."

Thus, as the trial court found, Mr. Alexander was well aware of the alleged issues with the affidavit more than a year before he instituted this action.

Mr. Alexander next makes a confusing allegation that the affidavit contains perjured testimony because it refers to efforts to serve him with a cease and desist order, referencing exhibit 2 (the 2009 cease and desist order), but the remainder of the paragraph "establishes a temporal period in 2007, not 2009." In connection with these allegations, he again, maintains that the only basis for a cease and desist order would be his engaging in the work of a private investigator without a license. Notably, the only reference to the year 2007 in the affidavit is merely an indication that Mr. Englade noted in memorandum in his records that Mr. Alexander's license

had expired and that he was not eligible to work as a private investigator in 2007.[24] The confounding nature of these allegations aside, Mr. Alexander raised the issue of the cease and desist order in prior lawsuit, including, at least the *Alexander I* case. Likewise, he had the affidavit in 2010, and whatever discrepancies he claims in the dates (2007 vs. 2009), should have been obvious at that time.

Mr. Alexander also suggests that Mr. Englade's affidavit indicated that "there was a criminal referral [which] represents perjured testimony." This allegation is based on Mr. Englade's 2014 deposition where he testified that he could not recall what criminal statute Mr. Alexander had violated and that the Board did not make a criminal referral. A review of Mr. Englade's affidavit reflects that Mr. Englade did not, in fact, attest to the fact that the Board had made a "criminal referral." Mr. Englade simply stated that the Board "contacted criminal authorities concerning its findings and considered jurisdiction over the matter transferred to other law enforcement authorities." Mr. Alexander's contention that this amounts to a false statement or perjury is baseless.

Even were it to be a patently false statement, the trial court noted that Mr. Alexander "received his criminal file from the State on December 19, 2012."[25] Thus, by receiving his criminal file from the State in 2012, Mr. Alexander would have known then whether a criminal referral had been made by the Board at least as of that time.

_____

[24] The August 27, 2007 actual memorandum to the file indicates that efforts were made to contact Mr. Alexander regarding the 2006 complaints but to no avail. Thus, the Board was closing the investigation pending further information about Mr. Alexander's whereabouts or in the event he attempted to renew his license.

[25] In a lawsuit filed by Mr. Alexander in the 29th Judicial District Court for the Parish of St Charles, as the trial court noted, the district court judge ordered the State of Louisiana to produce its file on Mr. Alexander. He received the file on December 19, 2012, as the *Alexander I* Court noted. *Alexander I*, p. 27, 211 So.3d at 562.

The remainder of Mr. Alexander's claims regarding perjury in Mr. Alexander's affidavit are confusing and appear to be pretexts and "red herrings" designed to circumvent a prescription claim.  Mr. Alexander cites isolated incidents from Mr. Englade's deposition or at trial where he appeared to have some confusion over the 2006 date in the affidavit, first indicating that the date should have been 2007, then indicating that the "2006 matters" "related to a complaint by the sister-in-law of Alexander, involving a municipal court hearing that evidence showed was actually April 2008 and not 2007."  Mr. Alexander asserts that Mr. Englade "changed the 2006 cease and desist order to a 2007 order," and that no 2007 cease and desist order existed; the only cease and desist order was the 2009 order, and Mr. Englade "had no idea what precipitated the February 2009 cease and desist order."  He then alleges that Mr. Englade falsely stated that the Board "began an administrative enforcement action" and cites various examples of allegedly inconsistent statements with respect to the issue of Mr. Alexander's status and whether he was exempt from the licensing requirements.

As the trial court found, issues concerning the validity of the cease and desist order and the circumstances of Mr. Alexander's work status as it relates to licensing requirements and exemptions were raised in his 2013 suit against the Board (*Alexander I*).  As such, Mr. Alexander was aware of these claims more than a year before he filed this suit.  We find no manifest error in these findings.

A review of the Petition in *Alexander I* reflects knowledge on Mr. Alexander's part, as alleged therein, of the alleged invalidity of the cease and desist order, having been based on the 2006 complaints, of the issue of whether the Board opened an "administrative file" on him and "did nothing but issue a second cease and desist order," of the issue of Mr. Alexander's "exempt status" and the Board's

15

alleged failure to determine the circumstances of Mr. Alexander's work for the City at that time. Indeed, in *Alexander I*, this Court recognized that Mr. Alexander's claims at the time were "that Mr. Englade, in particular, made false statements in his affidavit filed in the Centanni lawsuit, disseminated false information regarding the reasons for the cease and desist order and whether Mr. Alexander was exempt from licensure in 2009 and 2011" *Alexander I*, p. 19, 211 So.3d at 558.[26]

That Mr. Alexander was aware of the claims asserted in this suit well before he instituted this action is evident from his lawsuit against the Time-Picayune, *Alexander v. Times-Picayune L.L.C.* (*See* footnote 20). In that suit, Mr. Alexander alleged "that he could not have possibly known of the falsity of the claimed cease and desist order reported on in 2009 by Defendants until a witness at the 2014 trial testified that the cease and desist order was false." *Id.*, 16-1134, p. 7, 221 So.3d at 204. This Court rejected this contention, finding that Mr. Alexander was aware of his claims more than a year before he instituted that action in 2015 and, therefore, his claims had prescribed.

Thus, based on the record before us, we find that Mr. Alexander knew of his alleged claims more than a year before he filed the instant action on January 9, 2015, or at the least, had sufficient information or "notice . . . enough to excite attention . . . and call for inquiry." *Campo v. Correa*, 01-2707, p. 12 (La. 6/21/02), 828 So.2d 502, 510-11. Accordingly, we find no manifest error in the trial court's judgment granting the defendants' exceptions of prescription.

---

[26] *Alexander I* resulted in a damages award to Mr. Alexander, based on defamation and abuse of process. The *Alexander I* Court found that "insofar as Mr. Alexander's claims are based on the Defendants' pre–2011 actions (the February and March 2009 actions), those claims are prescribed." *Alexander I*, p. 48, 211 So.3d at 573.

16

**CONCLUSION**

Based on the foregoing, and the lack of any manifest error in the trial court's judgments granting the peremptory exceptions of prescription, we affirm those judgments.

**AFFIRMED**